GARY D. McGEHEE, CHRISTOPHER MICHAEL McGEHEE & SHELDON DUANE McGEHEE
v.
KEVIN CLARK BENTON, DR. TRACY BENTON, STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY & GEICO CASUALTY INSURANCE COMPANY
No. 2006 CA 2335.
Court of Appeals of Louisiana, First Circuit.
September 14, 2007.
NOT DESIGNATED FOR PUBLICATION
ROBERT E. KLEINPETER, JAY G. McMANIS, Counsel for Plaintiff/Appellee, Gary McGehee.
WILLIAM L. NEALY, II, RICHARD S. THOMAS, Counsel for Defendant/Appellant, GEICO Casualty Insurance Company.
ANDREW W. EVERSBERG, STEPHEN DALE CRONIN, Counsel for Defendant/Appellee, Kevin Benton & State Farm Mutual Auto Insurance Company
BRET T. WALSH, Counsel for Defendant/Appellee, Dr. Tracy Benton
Before: WHIPPLE, GUIDRY, and HUGHES, JJ.
WHIPPLE, J.
This is an appeal by GEICO from a judgment of the trial court finding coverage for the insured under a GEICO policy. For the following reasons, we affirm.

FACTS AND PROCEDURAL HISTORY
The facts of this matter, as alleged in plaintiffs' petition for damages, are as follows. On Sunday, May 25, 2003, Gary McGehee and his wife of twenty-seven years, Betty, were traveling in their restored 1972 Datsun in the southbound right lane of Interstate 55 in Pike County Mississippi, returning to their home in Magnolia, Mississippi, when they were struck from the rear by a Ford F-150 truck driven by twenty-year-old Kevin Benton. As a result of the impact, the McGehee vehicle was forced off of the road, rolled over one or more times, and came to rest in a pasture approximately 103 feet from the west boundary line of 1-55. After their vehicle was struck, Betty McGehee was ejected from the vehicle and died at the scene. Gary McGehee was extracted from the vehicle and transported by ambulance to the Southwest Mississippi Regional Medical Center Emergency Room for treatment of injuries sustained in the collision. At the scene of the accident, Gary was informed by authorities that his wife had been killed.
Kevin Benton, who was returning from a tubing trip on the Bogue Chitto River with his girlfriend and another couple, did not stop at the scene. Instead, he continued southward, exited the interstate at the next exit, and returned to Baton Rouge. Kevin was apprehended in Baton Rouge two days later.
At the time of the accident, Kevin resided in Baton Rouge with his father, Dr. Tracy C. Benton, and Ms. Louise Walker, his father's long-time employee and girlfriend, at 1660 Rosemont Drive. The Ford F-150 truck that Kevin was driving at the time of the accident was owned by Walker, who had insured the vehicle under a State Farm policy, and when Kevin began using the vehicle to drive to work, had added Kevin as a listed driver on the policy. Kevin was also a named insured on his father's GEICO policy (identified as "A-30LA (2-97)"), which provided Kevin UM coverage as a resident of his father's household. Kevin had been listed as an insured under the GEICO policy from the time he began driving at age fifteen. The Ford F-150, however, was not a listed vehicle under the GEICO policy. Rather, the policy listed a 1997 Mountaineer driven by Kevin's sister and a 1999 Ford Explorer driven by Kevin's brother, neither of which were garaged at Dr. Benton's residence.
By letter dated August 25, 2003, GEICO denied coverage under Dr. Benton's policy based on a purported "regular use" exclusion. In support, GEICO attached a copy of the A-30LA policy and cited to Section I, entitled, "Losses We Will Pay For," and the policy definitions of "non-owned auto," "owned auto," and "temporary substitute auto," which provide, as follows:
LOSSES WE WILL PAY FOR YOU UNDER SECTION I
Under Section I, we will pay damages which an insured becomes legally obligated to pay because of:
1. bodily injury, sustained by a person, and;
2. damage to or destruction of property, arising out of the ownership, maintenance or use of the owned auto or a non-owned auto. We will defend any suit for damages payable under the terms of this policy. We may investigate and settle any claim or suit.
* * * * *
SECTION I
DEFINITIONS
5. "Non-owned auto" means an automobile or trailer not owned by or furnished for the regular use of either you or a relative, other than a temporary substitute auto.

6. "Owned auto" means:
(a) a vehicle described in this policy for which a premium charge is shown for these coverages;
(b) a trailer owned by you;
(c) a private passenger, farm or utility auto which you obtain ownership of during the policy period or for which you enter into a lease for a term of six months or more during the policy period, if
(i) it replaces an owned auto as defined in (a) above; or
(ii) we insure all private passenger, farm and utility autos owned or leased by you on the date of the acquisition, and you ask us to add it to the policy no more than 30 days later.
(d) a temporary substitute auto

9. "Temporary substitute auto" means an automobile or trailer, not owned by you, temporarily used with the permission of the owner. This vehicle must be used as a substitute for the owned auto or trailer when withdrawn from normal use because of its breakdown, repair, servicing, loss or destruction.
GEICO contended that in order to be entitled to coverage for any losses, the policy required that Kevin be driving an "owned auto" or a "non-owned auto." GEICO contended that the vehicle Kevin was driving at the time of the accident was not listed on the policy and had been furnished for his "regular use." Thus, GEICO claimed, the vehicle did not qualify as a "non-owned auto" as defined in the policy. Accordingly, GEICO denied coverage for any losses under the policy.
The McGehees filed a petition for damages on May 11, 2004. On August 5, 2005, GEICO filed a motion for summary judgment, which was denied by the trial court by judgment dated October 12, 2005. Thereafter, on October 17, 2005, the McGehees filed a First Amended Petition alleging that in GEICO's denial letter, "GEICO [had] misrepresented that the regular use exclusion was in effect and barred the claim." The McGehees alleged that "[i]n truth and in fact, form A30LA does not interpose the regular use exclusion for bodily injury damage like that sustained by petitioners but only interposes it for property damage claims." (Emphasis added). The McGehees further contended that "[o]nce GEICO cleverly diverted the parties into believing the regular use exclusion was relevant, the parties then wasted almost two years obtaining affidavits regarding Kevin Benton's use supplemented with a number of depositions and documentary discovery." The McGehees alleged that GEICO's motion for summary judgment had improperly relied on the A-30LA policy and an endorsement form CC-1149 to that policy, which purported to apply the regular use exclusion to bodily injury claims. However, endorsement CC-1149 had not been quoted in, attached to, or footnoted in the denial letter. As noted by the McGehees, GEICO had issued a policy amendment which revised the terms of coverage under the policy. Specifically, GEICO'S Auto Policy Amendment CC-1149 revised the language under "LOSSES WE WILL PAY FOR YOU UNDER SECTION I," to seemingly apply the non-owned auto limitation to now include bodily injury claims as well as property damage claims. The amendment at issue reads, as follows:
Under Section I, we will pay damages which an insured becomes legally obligated to pay because of:
1. bodily injury, sustained by a person, or
2. damage to or destruction of property,
arising out of the ownership, maintenance or use of the owned auto or a non-owned auto. We will defend any suit for damages payable under the terms of this policy. We may investigate and settle any claim or suit.
Essentially, the McGehees claimed that GEICO misrepresented its policy when it denied the claim originally, and then attempted to "backfill" its misrepresentation in the summary judgment proceeding by including an endorsement form, which had never been disclosed or delivered before the claim arose. As a result of the misrepresentation on behalf of GEICO, the McGehees sought statutory damages and attorneys' fees over and above any policy limits that may be due.
Trial of the matter was bifurcated for an initial determination of whether there was coverage under the GEICO policy. At the conclusion of a September 12, 2006 hearing, the trial court rendered oral reasons for judgment finding that the GEICO policy provided coverage for the claims asserted herein. A written judgment was signed on September 21, 2006.
As set forth in its oral reasons for judgment, the trial court found that the Ford F-150 was furnished for Kevin's "regular use." Thus, the trial court found that Kevin seemingly would not have been covered while driving the Ford F-150 as a "non-owned auto" under the policy given the "regular use" exclusion contained in the definition of "non-owned auto" in the policy. Nonetheless, the trial court concluded, because GEICO's policy, under "Losses We Will Pay For You Under Section I," limited property damage coverage to that damage which arose from the use of an "owned auto" or "non-owned auto," but made no such qualification or limitation to claims for bodily injury, there was coverage afforded under the policy. The court further concluded that the provision at issue, standing alone, was ambiguous.
Noting that ambiguities which attempt to restrict coverage in a policy are interpreted against the insurer and in favor of coverage, the trial court further concluded that GEICO, apparently aware of the ambiguity in the policy itself, had issued endorsement CC-1149 to clarify the ambiguity apparent in the policy. The trial court determined that GEICO's CC-1149 endorsement was fashioned to "make it clear" that the "non-owned auto" coverage exclusion applies in both personal injury and in property damages claims. The trial court concluded, however, that based on the ambiguity of the policy and the lack of proof that the clarifying endorsement, CC-1149, was ever properly made a part of Dr. Benton's policy pursuant to the delivery requirements set forth in LSA-R.S. 22:628, GEICO could not rely on the exclusionary language contained in the endorsement to defeat the coverage owed under the policy. Thus, after finding that the original A-30LA policy language was ambiguous, the trial court concluded that there was coverage under the GEICO policy for the claims asserted by the McGehees, arising from Kevin Benton's negligence in causing the accident.
GEICO appeals, contending that the trial court committed manifest error: (1) in applying Ware v. Mumford, 2005-204 (La. App. 5th Cir. 7/26/05), 910 So. 2d 467, writ denied, 2005-2435 (La. 3/24/06), 925 So. 2d 1227, to find that GEICO did not meet the delivery requirements of LSA-R.S. 22:628; and (2) in finding that the policy was subject to more than one reasonable interpretation, and that the policy's exclusionary language is ambiguous and therefore, must be construed in favor of the insured.

DISCUSSION

Delivery of the Policy Amendment (Assignment of Error No. 1)
In GEICO's first assignment of error, GEICO contends the trial court erred in finding that GEICO failed to prove that the clarifying endorsement, CC-1149, was ever properly made a part of Dr. Benton's policy pursuant to the requirements set forth in LSA-R.S. 22:628.[1]
Pursuant to LSA-R.S. 22:628, insurance contracts must be in writing. Further, LSA-R.S. 22:634A provides that every policy of insurance shall be delivered to the insured or to the person entitled thereto within a reasonable period of time after its issuance. The law requires that an insured be informed of a policy's contents. Naquin v. Fortson, 1999-2984 (La. App. 1st Cir. 12/22/00), 774 So. 2d 1277, 1279. Notice of any exclusionary provisions is essential because the insured will otherwise assume the desired coverage exists. Thus, exclusions are not valid unless clearly communicated to the insured. Louisiana Maintenance Services, Inc. v. Certain Underwriters at Lloyd's of London, 616 So. 2d 1250, 1252-1253 (La. 1993). If an insurer fails to comply with the statutory requirement of delivery, it cannot rely on its policy exclusions. Naquin, 774 So. 2d at 1279.
GEICO contends that the trial court erred in applying Ware v. Mumford, 2005-204 (La. App. 5th Cir. 7/26/05), 910 So. 2d 467, writ denied, 2005-2435 (La. 3/24/06), 925 So. 2d 1227, and in finding that GEICO'S Endorsement CC-1149 did not meet the delivery requirements of LSA-R.S. 22:628. After careful review, we find no merit to these arguments.
In Ware, Farm Bureau contended that certain 1998 amendments to an auto liability policy Ware purchased in 1996, along with UM coverage equal to the limits of the policy, excluded coverage to Ware when driving a vehicle furnished to him by his employer, Jefferson Parish, for his regular employment duties. Ware, 910 So. 2d at 468. Ware's wife testified that when she purchased the policy in 1996, she made sure that the policy provided coverage to his parish vehicle because they knew that Jefferson Parish did not provide such coverage on its vehicles. She further testified that she did not recall ever having received notice of the 1988 exclusion changes in the UM coverage and noted that because the policy premiums did not change at the time the alleged amendment went into effect, she had no reason to think there had been any changes in the coverage. Ware, 910 So. 2d at 469. Farm Bureau offered the testimony of its policy services manager, who testified that although Farm Bureau had no documentary evidence showing that the new policy had been sent to the Wares and was actually received by the Wares, in the regular course of business all policy holders would have been sent notices of the change. Ware, 910 So. 2d at 468. The trial court found that under those circumstances, Farm Bureau had failed to comply with the notice requirements mandated in LSA-R.S. 22:628 and awarded damages accordingly. In affirming the trial court's award of damages, the court of appeal reasoned:
It is apparent that the trier of fact credited the testimony of Mrs. Ware and concluded that it was more probable than not that the papers were not sent. While this court might have made a different finding had it been sitting as the trier of fact, that is not the test here. Rather [,] under the manifest error standard the test is whether a reasonable trier of fact could have made the finding at issue considering the entire record of the case. Clearly, if Mrs. Ware's testimony is believed then it is reasonable to conclude that the papers were not sent to her. Because this finding does not constitute manifest error, we are precluded from setting it aside. As a consequence, the amendments to the policy were ineffective as to the Wares, and the trial judge properly awarded damages under the UM provisions of the original policy.
Ware, 910 So. 2d at 469.
In the instant case, both Dr. Benton and Ms. Walker testified that they were confident that Kevin was covered under the GEICO policy. Dr. Benton testified that Ms. Walker handled his personal and business financial affairs and insurance matters. He had authorized her to communicate with GEICO regarding his policy and he was always informed of all written and verbal communications. Ms. Walker often took notes of her communications with GEICO and showed him all written correspondence with GEICO, including policies when they arrived in the mail. Dr. Benton would give the GEICO representative permission to talk to Ms. Walker on the phone regarding his policy and would then "witness" the phone conversation. In fact, prior to the accident in May of 2003, they had contacted GEICO in an attempt to have Kevin removed as a named insured under the GEICO policy in order to reduce the policy premiums and because Kevin was also covered under the State Farm policy. GEICO, however, informed them that they were unable to remove Kevin as a named insured under the policy because he lived in the same household as Dr. Benton. Moreover, Dr. Benton and Ms. Walker testified that they had never received nor were they ever made aware of the CC-1149 endorsement amending the policy language until after the instant claims were asserted under the policy.
Vicki Mercer was called to testify by GEICO. Ms. Mercer was employed as a coverage underwriter by GEICO. She stated that her duties included determining whether a policy was in effect on a given day for the claims department. With reference to whether the "clarifying" endorsement, CC-1149, was ever properly made a part of Dr. Benton's policy, Ms. Mercer testified that the CC-1149 amendment was approved on June 21, 2002. In her opinion, the endorsement clarifying the policy (and restricting coverage) would have been mailed to Dr. Benton in the normal course of business, in the renewal packet dated September 1, 2002. She stated that the GEICO contracts and policies were generated and printed at the national print mail facility in Fredericksburg, Virginia, from where they were then mailed to the GEICO policy holder. However, she admitted she had never worked at the print mail facility and did not know when the CC-1149 amendment was mailed from the facility or if it was ever delivered to the Bentons. Ms. Mercer further testified that she had no knowledge as to whether the form was ever mailed to the Bentons, as it was not part of her duties. Rather, the forms would have been generated and mailed from an entirely different division of GEICO. Thus, the evidence offered by GEICO to show that the restrictive endorsement had been sent to Dr. Benton consisted solely of Ms. Mercer's testimony that it was GEICO's general business practice to do so.
As appellees correctly note, such evidence is not conclusive to prove the fact sought to be established. Evidence of a routine practice establishes only a prima facie case, which may be rebutted. Brown v. Permanent General Insurance Company, XXXX-XXXX (La. 3/14/01), 783 So. 2d 467, 470, writ denied, XXXX-XXXX (La. 6/1/01), 793 So. 2d 196. Further, the trial court's findings on whether the evidence sufficiently proves compliance with a routine practice in any particular instance cannot be disturbed absent manifest error. Brown, 783 So. 2d at 470.
On review, we find no error in the trial court's determination that the evidence offered by GEICO was insufficient to show that the CC-1149 endorsement had ever been sent to Dr. Benton. Moreover, even if we were to accept GEICO's argument that Ms. Mercer's testimony was sufficient to make a prima facie showing of delivery, (which we do not find), we agree with the trial court that the testimony of Dr. Benton and Ms. Walker shows that they had no knowledge or receipt of a copy of the CC-1149 endorsement. Thus, we find no error in the trial court's conclusion, given Ms. Mercer's testimony that although she had no knowledge that the endorsement was actually sent or received by Dr. Benton, a copy of the endorsement "should have been mailed" from a printing plant in another division of GEICO in Fredericksburg, Virginia. As the trial court correctly reasoned:
GEICO has no hard evidence of what it did, such as a copy of a policy that would have been sent to an agent, or a copy of a policy with a cover letter in a paper file somewhere in the underwriting department. Instead, GEICO can only state what it usually does or what it should have done. GEICO's reliance on its procedures is undermined by the evidence brought out by the plaintiffs of GEICO's inconsistencies in reproducing proper and complete copies of its purported policies in this case.
The language of LSA-R.S. 22:628 is clear and unambiguous in its mandate that endorsements effecting a change in coverage be "sent" to the policy holder. Given the record herein, we find no error in the trial court's ultimate determination that the GEICO policy applied herein. Instead, the record supports the court's rejection of GEICO's efforts to restrict coverage after these claims arose. Thus, the trial court properly found there was coverage under Dr. Benton's policy.[2]
Accordingly, we find no merit to this assignment of error.

Assignment of Error Number Two Ambiguity of the Policy
GEICO next asserts the trial court erred in its finding that the policy may be subject to more than one reasonable interpretation, and that the policy's exclusionary language is ambiguous and is to be construed in favor of the insured.
An insurance policy is an agreement between the parties and should be interpreted by using ordinary contract principles. Smith v. Matthews, 611 So. 2d 1377, 1379 (La. 1993). The judicial responsibility in interpreting insurance contracts is to determine the parties' common intent. LSA-C.C. art. 2045; Louisiana Insurance Guaranty Association v. Interstate Fire & Gas Company, 93-0911 (La. 1/14/94), 630 So. 2d 759, 763. If the language in an insurance contract is clear and explicit, no further interpretation may be made in search of the parties' intent. LSA-C.C. art. 2046. The court should not strain to find ambiguity where none exists. Andrews v. Columbia Casualty Insurance Company and Progressive Security Insurance Company, XXXX-XXXX (La. App. 1st Cir. 3/23/07), 960 So. 2d 134, 139.
However, if there is ambiguity in an insurance policy, it must be resolved by construing the policy as a whole; one policy provision is not to be construed separately at the expense of disregarding other policy provisions. See LSA-C.C. art. 2050; Louisiana Insurance Guaranty Association, 630 So. 2d at 763. Ambiguity will also be resolved by ascertaining how a reasonable insurance policy purchaser would construe the clause at the time the insurance contract was entered. Breland v. Schilling, 550 So. 2d 609, 610-611 (La. 1989). If, after applying the other general rules of construction, an ambiguity remains, the ambiguous contractual provision is to be construed against the insurer who issued the policy and in favor of coverage for the insured. See LSA-C.C. art. 2056; see also Louisiana Insurance Guaranty Association, 630 So. 2d at 764. Under this rule of "strict construction," equivocal provisions seeking to narrow an insurer's obligation are strictly construed against the insurer. For the rule of strict construction to apply, the policy must be susceptible to two or more interpretations, and the alternative interpretations must be reasonable. Bonin v. Westport Insurance Corporation, XXXX-XXXX (La. 5/17/06), 930 So. 2d 906, 911. The determination of whether a contract is clear or ambiguous is a question of law. McMath Construction Company, Inc. v. Dupuy, XXXX-XXXX (La. App. 1st Cir. 11/17/04), 897 So. 2d 677, 681, writ denied, XXXX-XXXX (La. 2/18/05), 896 So. 2d 40.
Here, the trial court determined that Kevin's use of the Ford F-150 to and from work five to six days a week and after work and on weekends with permission constituted "regular use" of the vehicle within the meaning of the policy exclusion. The trial court then concluded that under the original A-30LA policy, the limitation language in the "Losses We Will Pay For You Under Section I" section of the policy applied to property damage claims for losses arising from such use, i.e., the use of an "owned auto" and "non-owned auto," and that the policy contained no such limitation or exclusion to coverage for bodily injury claims. Thus, interpreting the language of the policy, the trial court found that coverage was seemingly provided therein for bodily injury claims. Upon review of the policy, we agree.
After discussing the ambiguities in GEICO's A-30LA policy, the trial court concluded:
GEICO's basic policy, identified as A-30LA (2-97) and attached to GEICO's initial denial of coverage letter, which is Exhibit McGehee One, appears in the "Losses We Will Pay" Section to bring the issue of a nonowned auto into play only in property damage situations and not where there is a claim for bodily injury. And that provision standing alone is indeed ambiguous. Of course, ambiguities in the policy which attempt to restrict coverage are interpreted against the insurer and in favor of coverage. Apparently aware of that possible ambiguity, GEICO issued endorsement CC1149 to clarify that situation. And in that endorsement, which is attached to Exhibit GEICO One, makes it clear that the "nonowned auto" issue applies in both personal injury and in property damages claims.
A plain reading of the A-30LA policy convinces us that the policy could reasonably be interpreted to mean that coverage is afforded for bodily injury claims, which an insured becomes obligated to pay because of bodily injury, and that coverage is not limited to those claims sustained or arising from the use of an "owned auto" or "non-owned auto." As the trial court found, the limitation urged by GEICO appears to apply to claims for damages or destruction of property. Further, we agree that the policy could reasonably be read to apply the coverage because the McGehees have asserted claims for bodily injury damages. We agree that GEICO's A-30LA policy, standing alone, affords coverage. While GEICO argues that the policy is not ambiguous, interpreting this provision to mean that both claims for bodily injury and property damage must arise from the use of an "owned auto" or "non-owned auto," the endorsement CC-1149 relied upon by GEICO constitutes an attempt by GEICO to clarify this apparent ambiguity in the policy. Considering this court's determination that the trial court correctly found that the endorsement had not been properly delivered herein, we agree with the trial court that the original A-30 policy is subject to more than one reasonable interpretation, in that the policy's exclusionary language is ambiguous, coverage is to be construed in favor of the insured. See Bonin, 930 So. 2d at 911.
Accordingly, after thorough review of the record herein, we find no error in the trial court's ultimate determination that the GEICO A-30LA policy was ambiguous or its determination that GEICO's CC-1149 endorsement was confected in an attempt, albeit unsuccessful herein, to cure the ambiguity (by making it clear that the non-owned auto limitation upon coverage applies to both personal injury and in property damage claims).
This assignment also lacks merit.

CONCLUSION
Based on the above and foregoing reasons, the September 21, 2006 judgment of the trial court is affirmed. Costs of this appeal are assessed against the appellant, GEICO.
AFFIRMED.
HUGHES, J., dissenting.
I respectfully dissent. Despite several red herrings, the only issue is whether the CC 1149 "regular use" endorsement was mailed to the insureds as the normal business practice of the insurer.
The trial court correctly found as facts that the subject vehicle was furnished for Kevin Benton's regular use, that there was "no evidence" Geico was ever paid a premium for this use, and that Geico issued CC 1149 to clarify an ambiguity in the original policy language.
The trial court further noted that testimony of a normal business practice (mailing of endorsements) is prima facie evidence subject to rebuttal. The trial court then stated "I do not recall either one of them (neither Dr. Benton nor Ms. Walker) specifically saying they had not seen or received endorsement CC 1149."
Having accurately determined these facts, I would respectfully submit that the trial court erred in its application of the law to them. In interpreting LRS 22:628, in light of the case of Naquin v Fortson, 774 So.2d 1277 (1st Cir. 2000), the trial court holds that the burden of proof is shifted to the insurer to prove that an endorsement was "actually communicated" to the insured. To the contrary, the Naquin case held that notice to an association, rather than individual members thereof, sufficed.
The statute does not require personal service or registered mail, only regular mail in the normal course of business. Testimony to this effect in the instant case was not rebutted. In fact, when the question was put squarely to Dr. Benton, he responded "I couldn't tell you" and then admitted "if you say that's the case, I believe you." (trial transcript page 57)
NOTES
[1] Pursuant to the Louisiana Insurance Code, as set forth in LSA-R.S. 22:628, entitled, "Must contain entire contract with exceptions," provides as follows:

No agreement in conflict with, modifying, or extending the coverage of any contract of insurance shall be valid unless it is in writing and physically made a part of the policy or other written evidence of insurance, or it is incorporated in the policy or other written evidence of insurance by specific reference to another policy or written evidence of insurance. This Section shall not apply to contracts as provided in Part XV of this Chapter.
The provisions of this Section shall apply where a policy or other written evidence of insurance is coupled by specific reference with another policy or written evidence of insurance in existence as of the effective date hereof or issued thereafter.
Any written agreement in conflict with, modifying, or extending the coverage of any contract of insurance shall be deemed to be physically made a part of a policy or other written evidence of insurance, within the meaning of this section, whenever such written agreement makes reference to such policy or evidence of insurance and is sent to the holder of such policy or evidence of insurance by United States mail, postage prepaid, at such holder's last known address as shown on such policy or evidence of insurance or is personally delivered to such holder.
[2] See also Brown, 783 So. 2d at 470-471, where despite the fact that the insureds had requested that their automobile insurance policy limits be amended to reduce coverage and had paid a reduced premium, given their testimony that they had not received a copy of the policy endorsement, evidence of an automobile liability insurer's routine business practices was not conclusive to show that an endorsement lowering liability limits on the insureds' vehicles met the delivery requirements of LSA-R.S. 22:628.